1  John Burton, State Bar No. 86029
   jb@johnburtonlaw.com
2  THE LAW OFFICES OF JOHN BURTON
   128 North Fair Oaks Avenue
3  Pasadena, California 91103
   Tel. (626) 449-8300
4
   Paul L. Hoffman, State Bar No. 71244
5  hoffpaul@aol.com
   UCI LAW CIVIL RIGHTS LITIGATION CLINIC
6  401 E. Peltason, Suite 1000
   Irvine, California 92697
7  Tel: (310) 717-7373

8  Attorneys for Plaintiffs Leslie Gilbert, Individually and
   As Successor In Interest To Scott Thomas Gilbert, and Greg Gilbert
9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13 LESLIE GILBERT, individually and as successor in interest to SCOTT THOMAS GILBERT, decedent, and GREG GILBERT, | Case No. 19-CV-8599-MWF-RAO |
| 14 | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 15 | |
| 16 Plaintiffs, | |
| 17 v. | **Date: August 15, 2022** |
| 18 COUNTY OF LOS ANGELES, et al., | **Time: 10:00 a.m.** |
| 19 Defendants. | **Before United States District Judge Michael W. Fitzgerald** |

20

21

22

23

24

25

26

27

28

# Table of Contents

**Contents**                                                                                    **Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Summary of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    Background of Scott Gilbert's Family and His Mental Illness . . . . . . . . . 3

        B.    The LAPD Arrested Scott Gilbert While Manic . . . . . . . . . . . . . . . . . . . 5

        C.    The LAPD Took Scott To the Los Angeles County Jail
              Mental-Health Unit For Evaluation and Treatment That
              He Never Received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.    Plaintiff Leslie Gilbert Called Jail Mental Health To
              Help Her Son . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        E.    Nurse Turner Released Scott While Manic, and Falsified the Chart. . . . . 7

        F.    The Death of Scott Gilbert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    Defendants Violated Decedent's Fourteenth-Amendment Rights . . . . . . . . . . 10

        A.    Decedent Had a Fourteenth-Amendment Right to Restorative Care. . . . 10

        B.    Defendants Were Objectively Deliberately Indifferent To
              Decedent's Serious Mental-Health Needs, Causing His Death. . . . . . . . 12

        C.    Defendants Violated Decedent's Right to Be Free from
              Deliberate Indifference to State-Created Danger. . . . . . . . . . . . . . . . . . 13

IV.     Genuine Issues Preclude Summary Judgment As to Each Defendant . . . . . . . 14

        A.    The County Was Deliberately Indifferent . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    Defendants Belavich Is Subject To Supervisory Liability . . . . . . . . . . . . 16

        C.    Defendant Turner Is Not Entitled to Qualified Immunity . . . . . . . . . . . 18

V.      The County Violated the ADA and the RA By Excluding Decedent
        From Treatment For His Mental Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.     Plaintiffs Have Alleged Wrongful-Death Claims Under Cal Gov't Code
        § 845.6 For Failure To Summon Medical Attention and For Negligence . . . . . 23

VII.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## Table of Authorities

2

**Cases**                                                                                    **Page(s)**

3
*A.K.H. rel. Landeros v. City of Tustin,*
   837 F.3d 1005 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

4
*Ammons v. Washington Dep't of Soc. & Health Servs.,*
   648 F.3d 1020 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

5

6
*Anderson v. Cty. of Siskiyou,*
   No. C 10-01428 SBA, 2010 WL 36198215 (N.D. Cal. Sept. 13, 2010) . . . . . 22-23

7
*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

8

9
*Atayde v. Napa State Hosp.,*
   255 F. Supp. 3d 978 (E.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22

10
*Cabrales v. County of Los Angeles,*
   864 F.2d 1454 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

11

12
*Castro v. County of Los Angeles,*
   833 F.3d 1060 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,12,15

13
*Clouthier v. County of Contra Costa,*
   591 F.3d 1232 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,12

14

15
*Drummond v. City of Anaheim,*
   343 F.3d 1052 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

16
*Estelle v. Gamble,*
   429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

17

18
*Fairley v. Luman,*
   281 F.3d 913 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

19
*Flores v. Natividad Medical Center,*
   192 Cal. App. 3d 1106 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

20

21
*Gordon v. County of Orange,*
   888 F.3d 1118 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

22
*Groh v. Ramirez,*
   540 U.S. 551 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

23

24
*Headwaters Forest Def. v. County of Humboldt,*
   276 F.3d 1125 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

25
*Hernandez v. City of San Jose,*
   897 F.3d 1125 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

26

27
*Hope v. Pelzer,*
   536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

28

**Table of Authorities (Continued)**

**Cases**                                                                                     **Page(s)**

*Horton by Horton v. City of Santa Maria,*
        915 F.3d 592 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,16,23

*Jett v. Penner,*
        439 F.3d 1091 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Johnson v. County of Los Angeles,*
        143 Cal. App. 3d 298 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kennedy v. City of Ridgefield,*
        439 F.3d 1055 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,14

*Kingsley v. Hendrickson,*
        135 S. Ct. 2466 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Larez v. City of Los Angeles,*
        946 F.2d 630 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Los Angeles County v. Humphries,*
        562 U.S. 29 (2010) (quoting *Monell,* 436 U.S. at 690-91). . . . . . . . . . . . . 15

*Lovell v. Chandler,*
        303 F.3d 1039 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*L.W. v. Grubbs,*
        974 F.2d 119 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Malley v. Briggs,*
        475 U.S. 335 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Maxwell v. County of San Diego,*
        708 F.3d 1075 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Neely v. Feinstein,*
        50 F.3d 1502 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ohlinger v. Watson,*
        652 F.2d 775 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Okin v. Village of Cornwall-On-Hudson Police Dept.,*
        577 F.3d 415 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Olsen v. Idaho State Bd. of Medicine,*
        363 F.3d 916 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Oregon Advoc. Ctr. v. Mink,*
        322 F.3d 1101 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Penilla v. City of Huntington Park,*
        115 F.3d 707 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Table of Authorities (Continued)**

**Cases**                                                                                     **Page(s)**

*Pennsylvania Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Pierce v. County of Orange,*
    526 F.3d 1190 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tsao v. Desert Palace, Inc.,*
    698 F.3d 1128 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. County of Los Angeles,*
    No. 15-CV-5903 DDP, 2016 WL 2885855 (C.D. Cal. May 17, 2016) . . . . . . 17,23

*United States v. Georgia,*
    546 U.S. 151 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wakefield v. Thompson,*
    177 F.3d 1160 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

*Wilkins-Jones v. County of Alameda,*
    859 F. Supp. 2d 1039 (N.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wright v. Smith,*
    21 F.3d 496 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Young v. County of Los Angeles,*
    655 F.3d 1156 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Youngberg v. Romeo,*
    457 U.S. 317 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10

**Other Authorities**

U.S. Const. Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10,12

29 U.S.C. § 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. 42.540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 12131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. Gov't Code § 845.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,23,25

Cal. Civ. Code § 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,25

Cal. Welf. & Inst. Code § 5150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,10,13,18,20

Ninth Circuit Model Jury Instruction No. 9.4 (Rev. Sept. 2018) . . . . . . . . . . . . . . . 17

## I.      Introduction

Plaintiffs bring this § 1983 action because the County Jail's deliberate indifference to their son's urgent mental-health crisis led directly to his death.

Scott[1] impulsively flew from his family home in Wisconsin to Los Angeles with a friend. Diagnosed bipolar and off medications, Scott quickly became manic, alienated his friend and lost his wallet. The LAPD arrested him for disruptive behavior and took him to Los Angeles County Jail for essential mental-health treatment he never received.

Jail policy required Scott to be examined by a psychiatrist, who would have administered psychotropic medications to quell the mania. That did not happen. The only mental-health worker Scott saw after being classified as "urgent" and "significantly impaired" was a registered nurse who rubber-stamped his release. She falsified his chart, stating he was asymptomatic, and ignored his family's efforts to help. Scott was released after two-and-a-half days as manic as when he arrived. After wandering 20 hours with nothing but the clothes he wore when arrested, Scott jumped to his death.

Defendants seek summary judgment, contending that they owed no duty to protect Scott after releasing him. Plaintiffs' contend, however, "viewing the evidence in the light most favorable to . . . the non-moving party," *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004), that genuine issues preclude summary judgment on whether Defendants breached duties owed Scott *while he was in their custody* when they eschewed reasonable options, instead releasing Scott manic, alone and penniless.

The Fourteenth-Amendment guarantees people in the government's custody the right to restorative treatment. *Youngberg v. Romeo*, 457 U.S. 317, 321 (1982). Moreover, pretrial detainees have the Fourteenth-Amendment right to be free from deliberate indifference in medical care, which includes protecting the mentally ill from self harm. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010), *overruled on other grounds, Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

---

[1]To differentiate among the several Gilberts, this brief uses their first names.

By allowing Scott's mania to remain untreated for more than two days—likely exacerbated by the stress of jail and lack of sleep—and then releasing him without a viable release plan, rather than sending him to a psychiatric facility on an involuntary 72-hour hold, or at least connecting him with the family members trying to help, Defendants "affirmatively place[d] the [decedent] in a position of danger." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).

The County itself is responsible because in the jail context "constitutional deprivations may occur . . . 'as a result of the collective inaction' of the municipal defendant." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019) (quoting  *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002). Defendant Timothy Belavich, Ph.D., is the director of Mental Health services in the jail and has supervisory liability for the systematic failures that allowed Scott to go untreated and to be released with no plan or resources. The jail's safety net, the mandatory discharge evaluation, failed because Defendant Trieste Turner, R.N., was deliberately indifferent to Scott's welfare. She ignored his disabling mania and his mother's offer to help, and falsified the discharge record to make it appear that Scott could be released safely.

Plaintiffs are entitled to relief against the County under the ADA and Rehabilitation Act (RA) because Scott was excluded from participation in the County's mental health services, despite County officials knowing that he was bipolar, manic and in desperate need of treatment. Finally, Plaintiffs have stated state-law theories of relief under Cal. Gov't Code § 845.6 and negligence.

Exhibit 1 is a composite of video excerpts showing Scott's behavior before and after his arrest. Exhibits P, Q and R, show him surrounded by jail deputies the following evening, and his informing their supervisor about his "bipolar 1 diagnosis." Exhibits N and O show that Scott was just as manic when released two-and-a-half days later. These videos confirm the opinion testimony of Plaintiffs' psychiatric expert Nathan A. Lavid, M.D., and controvert Defendants' contention that Scott was fit to be released. Because the parties dispute genuine issues, the motion should be denied.

1    **II.    Summary of Facts**

2    **A.    Background of Scott Gilbert's Family and Mental Illness**

3       Plaintiffs Greg Gilbert, a financial planner, and Leslie Gilbert, a high school

4    biology teacher, raised two sons, Scott and younger brother Stephen. Scott was good

5    student, and attended two years of college.  Lavid Decl., para. 23; Greg Dep. 14:10-13.

6    Although the parents separated, the family stayed close. Scott and his father operated

7    Gresco Marketing, a profitable business technology company. G. Gilbert Dep. 43:21-

8    24, 48:17-23. Scott was living with his mother when he died. Leslie Dep. 37:18-22. The

9    brothers were in contact several times a week. S. Gilbert Depo. 11:10-11.

10       Scott had a normal childhood until he suffered his first manic episode at age 16.

11    Leslie Dep. at 65:8-10. He could not sleep after returning from a vacation in Mexico. *Id.*

12    at 72:11. He was talking fast and nonsensically, eyes darting back and forth, agitated,

13    overly affectionate and impulsive. *Id.* at 72:8-12; Greg Dep. at 29:5-6. Scott declared

14    himself God and that he cured things with his mind. Lavid Decl., para. 24. His parents

15    brought Scott to St. Mary's Hospital in Madison, Wisconsin, where he was diagnosed

16    with Bipolar 1 Disorder, with acute mania and psychosis, and started on Zyprexa and

17    lithium, to which he responded. *Id.*, para. 24; Leslie Dep. 72:20-24; Greg Dep. 30:14.

18       Thereafter, Scott had "numerous" visits to mental health facilities for

19    medications, which consistently alleviated the mania. Greg Dep. 31:9, 17; Leslie Dep.

20    76:3-5. In 2010, Scott experienced another manic episode, this one in Arkansas, where

21    he tried to swim across a river, leading to another hospitalization. *Id.*, 24:24-25:2; 77:1-

22    13; 80:1-4. Medication again allowed Scott to control his behavior. *Id.* at 80:17; Greg

23    Dep. 34:6-15. Scott developed the pattern of taking medications until he felt better, but

24    then stopping because he did not like the side effects. Lavid Decl., para. 28.

25       Scott was hospitalized several more times over the years, always secondary to

26    mania. There was another episode in Mexico in 2015. Leslie Dep. 82:2-11. In Hawaii in

27    2016, Scott spent several days in a psychiatric unit, an episode he described in an

28    insightful Facebook post prescient of what happened in Los Angeles.

1      I had lost my wallet . . . . I spent a couple of days walking around

2      Kona, Hawaii. . . . Things got really rough though when my instincts told

3      me that it was time for me to end my life.

4      Thankfully, my rational mind wasn't on board for carrying that out,

5      but I tried. I ran down a street with a big incline, closed my eyes and

6      jumped headfirst toward the pavement, hoping that my soul would leave

7      my body and fly back up to heaven (or something like that).

8      . . . . A kind, older middle-aged couple came by and looked after

9      me, and alerted the police of the situation. When the officers had me stand

10     up, I still felt like I really needed to end my life. . . .  I reached for one of

11     the officer's guns when he had his back turned. I think I touched the gun,

12     but the cop's instincts were good and he whipped around and had me

13     pinned on the ground, hard, before I could do anything stupid.

14     I spent the next few days in the psychiatric unit of Kona

15     Community Hospital. They got me taking some psych medications. When

16     my brother and Dad heard about what I tried to do, they dropped

17     everything in their lives and flew out to Hawaii to help me out.

18     Lavid Decl., para. 28; *see* Leslie Dep., 38:14-15, 47:16-20, 4:23-85:6; Greg Dep. 36:3-8.[2]

19      Matthew Sager, MD, the psychiatrist who treated Scott during 2017 and 2018

20     hospitalizations, wrote that although Scott sometimes lacked insight into the "needs of

21     his bipolar disorder," he dramatically improved with psychotherapy and medication and

22     had "enormous" potential to have a normal quality of life. Lavid Decl., para. 29.

23

24

25     [2]Dr. Lavid observed, "This Facebook post obviously gives powerful insight into
       Mr. Gilbert's subjective views of his own mental illness and family support. The
       symptoms described are classic for Bipolar I Disorder and episodes of mania. The post
26     shows a high degree of intelligence and ability to communicate along with both good
       insight and denial, a difficult combination seen with patients afflicted by this disorder.
27     The vivid descriptions are easily transferrable to his Los Angeles experiences that
       culminated in his death, the one glaring difference being that, unlike the other cases, in
28     Los Angeles there were no positive interventions." Lavid Decl., para. 28.

- 4 -

1    For the thirteen months before his death, Scott shared a condominium with his

2    mother, contributing a thousand dollars a month to rent and expenses. Leslie Dep.

3    37:22; 63:1, 12-14. Greg saw Scott for the last time at a friend's birthday party the

4    weekend before Scott left for Los Angeles. Scott was doing well, showing no signs of

5    mania. Greg Dep. 62:4-21. A female friend, Audrey Jacobs, stayed with Scott at the

6    condominium commencing September 6, 2018. Defs.' UF No. 3; Jacobs Dep. 18:9-11.

7    Everything seemed to be going well—until Scott impulsively flew to Los Angeles with

8    Audrey on Thursday, September 13. Defs.' UF Nos. 4-5; Jacobs Dep. 57:22-25.

9    **B.      The LAPD Arrested Scott Gilbert While Manic.**

10    At Audrey's residence late on September 13, Scott inappropriately proposed

11    marriage, which she declined. After a restless night, Scott grabbed Audrey's arm the

12    next morning, leading them to split up. Defs.' UF Nos. 5-7; Jacobs Depo. at 23:10-

13    24:12. Audrey met Scott later that day to turn over belongings except "his hat and his

14    bunny," which she kept. Scott "seemed very put together, like all the nonsense from

15    earlier was just gone, and he was fine, and he was going to go back to Wisconsin and be

16    with his family after he got his stuff from me. And that was his plan." *Id.* at 24:13-22;

17    Defs.' UF No. 8. Scott confirmed that plan with his brother Stephen, who arranged an

18    Airbnb so Scott could get some rest. Defs.' UF No 9-10. Late afternoon on Saturday,

19    September 15, Scott texted, "Hey, Mama, I'm doing fine, having a good time exploring

20    city life around LA." UF 12. That was his last communication to family or friends.

21    About an hour later, LAPD officers summoned by security arrested Scott outside

22    660 South Figueroa Street. Defs.' UF Nos. 13-14. Exhibit 1 is a brief composite of

23    excerpts from surveillance and LAPD videos depicting events leading to his arrest and

24    his attempts to explain his conduct to the officers, attributing it to his bipolar disorder.

25    "The videos of his arrest, which show him walking around barefoot, triggering alarms,

26    acting and speaking irrationally, confirm" Scott was "in the throes of a manic episode."

27    Lavid Decl., para. 5. "He told officers that he was bipolar, and after being 'fired by my

28    psychiatrist' had not taken medications." *Id.*, para. 34.

- 5 -

At booking Scott had no wallet, identification or credit cards; he had only his
cellphone, a backpack and $1.79. Defs.' UF 16. His "Arrestee Medical Screening Form"
disclosed prior suicide attempts and mental-health treatment. Ex. L-136-37.

**C.    The LAPD Took Scott To the Los Angeles County Jail Mental-
Health Unit For Evaluation and Treatment That He Never Received.**

The next day, Sunday, September 16, the LAPD took Scott to the Los Angeles
County Jail Inmate Reception Center (IRC) with a Behavioral Observation and Mental
Health Referral (BOMHR) listing Scott's suicidal statements and inability to follow
instructions. Ex. L-134. Videos show Scott in the IRC, manic, dressed in a "suicide
smock," in chains, surrounded by more than a dozen jail deputies, eventually telling
their supervisor he has "a Bipolar 1 diagnosis." Exs. Q and R; Lavid Decl., para. 36.

Alfredo Vilgera, R.N., conducted the initial medical screening late in the evening
of September 16. He expedited Scott's referral to mental health based on "Exhibiting
behavior: danger to self/others," charting "BIZARRE, HX BI-POLAR." Ex. L-149-50;
Defs.' UF 22. Alan Suyehara, R.N.P., a medical provider, diagnosed Scott with a
"psychiatric disorder," and charted that Scott reported "my last psychiatrist fired me for
missing my appts." Ex. L-123; Suyehara Dep. 37:19-25. Nurse Practitioner Suyehara
determined Scott ineligible to self-administer Tylenol for pain "based on his psychiatric
history," as he might "do an intentional overdose to harm himself." *Id.*, 42:17-43:7.

Shortly after midnight on Monday, September 17, Raul Hernandez, R.N.,
conducted the initial mental-health screening. Ex. L-121-24; Defs.' UF 23, 25. Nurse
Hernandez documented Scott's Bipolar I Disorder had been treated with Lithium and
Zyprexa, the last doses two months prior. Ex. L-122; Lavid Decl. 37. Nurse Hernandez
classified Scott as "P level (3)," Ex. L-122, meaning "significant impairment" requiring
"High Observation Housing (HOH)," for "an intensive level of observation and care."
Ex. U-183, Ex. X-199; Ex. L-122; Defs.' UF No. 25.

Inmates assigned to HOH are deemed "Urgent" under jail mental-health policy.
Peña Dep. 23:20-24. They "shall be evaluated within one working day . . . by the

- 6 -

assigned psychiatrist." Ex. CC-231. Scott was transferred to his HOH cell around 2:50
a.m. on September 17, Feroli Decl. 5(b)(ii); Defs.' UF No. 28, but was not seen by a
psychiatrist that day, according to the County's designated spokesperson, Luis Peña,
because Scott went to court *the following day*, September 18, 27 hours after arrival at
HOH. Peña Depo. 23:25-24:6. "Had the evaluation taken place and medications
commenced there likely would have been no death here." Lavid Decl., para. 38.

**D.    Plaintiff Leslie Gilbert Called Jail Mental Health To Help Her Son.**

Scott was taken to court at 7:00 am on Tuesday, September 18, a day-and-a-half
after arriving at the jail. Defs.' UF Nos. 32-33. He never saw a judge, however, and was
returned to HOH that evening. Defs.' UF Nos. 32-33.

That same day Leslie learned her son was in custody. Leslie Dep. 107:10-16.
Around noon, while Scott was at court, Leslie spoke on the phone with Esmeralda
Lomeli, a mental-health supervisor, for almost an hour. Leslie Dep. 24:15-26:19.
According to the jail mental-health chart, Leslie told Ms. Lomeli:

> her son had recently traveled to L.A. with a friend [this past weekend
> 9/15-9/16] and somehow parted ways with his friend and had a manic
> episode and got arrested. Mother reports son has bipolar disorder—has
> been treatment resistant . . . does not like the way meds make him feel,
> "foggy." She says he has been hospitalized inpt. a few times this past year
> in Wisconsin for manic episodes.

Ex. L-123 (ellipsis and brackets in original). Leslie gave Ms. Lomeli her phone number,
which is recorded in the chart. *Id.* Leslie followed Ms. Lomeli's suggestion that she
purchase a telephone card. Leslie called Ms. Lomeli twice, trying to confirm that Scott
received the card, but neither call was returned. Leslie Dep. 25:8-27:2.

**E.    Nurse Turner Released Scott While Manic, and Falsified the Chart.**

Because there was no criminal filing, and therefore no arraignment, Scott was to
be released on Wednesday, September 19. Defs.' UF Nos. 36, 38. Scott remained
subject to a 72-hour hold pursuant to Cal. Welf. & Inst. Code § 5150, however.

At 9:45 that morning, Defendant Trieste Turner, R.N., met with Scott to do a release evaluation in the HOH dayroom. According to the applicable jail policy:

> Release evaluations shall be conducted for mental health clients prior to release to the community in order to review with them the release plan documented in the medical record and assist with implementing the plan, or, based on assessment that a client meets 72-hour hold criteria, initiate the hold and arrange transportation to a non-correctional acute psychiatric hospital for evaluation and treatment.

Ex. DD-237. The person assigned to make the "assessment," Nurse Turner, however, was not authorized to place Scott on a 72-hour hold. Turner Dep. 50: 7-12. She made no effort to review or implement a release plan. Instead, Nurse Turner falsely charted:

> [Patient] exhibits [zero symptoms] of neither acute physical nor psychiatric distress. Patient exhibits good insight into maintaining healthy state of mental health and *verbalizes intention to maintain compliance with psychotropic medication regimen upon release*.

Ex. L-123 (italics added). Because he had not seen a jail psychiatrist, despite jail policy, Scott had no access to psychotropic medications, had not been taking any, and therefore had no ability to "maintain compliance" even if he wanted to.

Nurse Turner charted that Scott "verbalizes plan to take public transportation and return to previous place of residence," which was Madison, Wisconsin. Ex. L-123. When confronted at her deposition with the facts that Scott had alienated Audrey, the only person he knew in Los Angeles, that he could not take "public transportation" to Wisconsin, that he had no identification and could not board a plane, that he did not have a local doctor or access to psychotropic medications, that he was not receiving general relief, and that he had $1.79 in property, Nurse Turner says she did not "delve into" such information when documenting a release plan because that was beyond her "scope." Instead, she claims her evaluation was based on what Scott told her, Turner Dep. 62:4-6; 64:3-4; 65:5-6, and cleared him for release. Ex. L-123; Defs.' UF No. 44.

1    Nurse Turner had the chart with Ms. Lomeli's note that Scott's mother Leslie

2    reported he "has been hospitalized inpt. a few times this past year in Wisconsin for

3    manic episodes," and her telephone number. At deposition, Nurse Turner refused to

4    acknowledge whether she considered, or even read Ms. Lomeli's chart entry about the

5    multiple, recent psychiatric inpatient hospitalizations for "manic episodes," and she

6    made no effort to put Scott in touch with his mother because "that's not within my

7    scope of doing the release evaluation." Turner Dep. 66:24-70:12.

8    Exhibits N and O, surveillance videos from the IRC "release lobby" made a few

9    hours later, depict Scott "clearly hyperactive and pacing," just as symptomatic with

10   mania as when he was arrested by LAPD and when he arrived at the IRC. Scott was

11   "bouncing around the room, unable to present himself at the property window to

12   retrieve his cell phone and other property, as the other inmates were doing. He left the

13   jail with nothing but the clothes he was wearing." Lavid Decl., para. 12. No one notified

14   Scott's family of his release. Leslie Dep. 33:8.

15   **F.    The Death of Scott Gilbert**

16   There is no evidence regarding Scott's actions over the next 20 hours. At 9:00

17   a.m. on Thursday, September 20, 2018, exactly week after he left Wisconsin with

18   Audrey Jacobs, Scott jumped off a parking structure that was less than a mile from the

19   Jail. Lavid Decl., para. 42. First responders found him barely responsive with multiple

20   traumatic injuries and rushed him to LAC + USC Medical Center for treatment of

21   multiple traumatic injuries. Ex. K; Defs.' UF Nos. 59-60; Lavid Decl., para. 42.

22   The family found out about Scott's hospitalization on September 21 because

23   Leslie "relentlessly" contacted law enforcement and hospitals. Stephen Dep. 39:1-5;

24   Lavid Decl., para. 44. The family immediately flew to Los Angeles, went straight to the

25   hospital, and stayed in the ICU for most of the next three days. Stephen Dep. 39:11-18.

26   Scott succumbed to his multiple traumatic injuries on September 25, 2018. Ex. K.

27

28

**III.    Defendants Violated Decedent's Fourteenth-Amendment Rights.**

      **A.    Decedent Had a Fourteenth-Amendment Right to Restorative Care.**

      This case is the inverse of many § 1983 actions, where the deprivation arises from an unreasonable seizure. Here the release was unreasonable, as Scott's untreated severe manic state while penniless and isolated in a strange city exposed him to an unreasonable risk of self harm. The Fourteenth Amendment's due-process guarantee of "liberty" includes the right of people in government custody due to mental illness to restorative treatment before being released.

      Scott was transferred by the LAPD to County custody with a BOMHR, which functions analogously to a civil commitment for mental-health treatment under Cal. Welf. & Inst. Code § 5150 and similar statutes. The Ninth Circuit recognizes the "liberty interest in receiving restorative treatment. We have held that civilly committed persons must be provided with mental health treatment that gives them a realistic opportunity to be cured or improve the mental condition for which they were confined." *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003).

      "As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. . . . When a person is institutionalized— and wholly dependent on the State," however, "a duty to provide certain services and care does exist." *Youngberg v. Romeo*, 457 U.S. 317, 321 (1982). Their "substantive due process rights" are "determined by balancing their liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state." *Oregon Advoc. Ctr.*, 322 F.3d at 321 (citing *Youngberg*, 457 U.S. at 321 (1982)).

          According to *Youngberg*, the Constitution requires that hospital officials, in order to protect a patient's right to safe conditions, exercise professional judgment. [*Youngberg*, 457 U.S. at 321-22]. The Court explained that liability may be imposed for failure to provide safe conditions "when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or

1    standards as to demonstrate that the person responsible actually did not
2    base the decision on such a judgment." [*Id.* at 323] *Youngberg*, then, created
3    a standard whereby whether a hospital administrator has violated a
4    patient's constitutional rights is determined by whether the administrator's
5    conduct diverges from that of a reasonable professional. We refer to this
6    as the "*Youngberg* professional judgment standard."

7  *Ammons v. Washington Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011)

8  (footnote omitted). The standard is "necessarily an objective test." *Id.* at 1029 (quoting

9  *Neely v. Feinstein,* 50 F.3d 1502, 1508 (9th Cir. 1995). The right to restorative treatment

10  does not depend on resources allocated to protect the mentally disabled. "'Lack of

11  funds, staff or facilities cannot justify the State's failure to provide [such persons] with

12  [the] treatment necessary for rehabilitation.'" *Id.* (quoting *Ohlinger v. Watson*, 652 F.2d

13  775, 779 (9th Cir. 1980) (brackets in original)).

14        The Los Angeles County Jail mental-health system failed Scott Gilbert, depriving

15  Plaintiffs of their son. The LAPD entrusted Scott to the County Jail with a BOMHR

16  because he needed the mental-health intervention that the County Jail mental-health

17  unit was established to provide. The intake nurses did their job. In particular, Nurse

18  Hernandez charted the Bipolar 1 Disorder diagnosis and assigned Scott to HOH, which

19  triggered an "urgent," next-day appointment with a psychiatrist, who would have

20  administered psychotropic medications to counteract Scott's mania.

21        Instead, by releasing Scott two days later, sleep-deprived, without an evaluation

22  by a psychiatrist qualified to prescribe medications, without an evaluation by a mental-

23  health professional qualified to impose a 72-hour hold, without resources, without a

24  plan, and without being put in contact with his family, Defendants set the stage for the

25  tragedy that followed.

26

27

28

**B.      Defendants Were Objectively Deliberately Indifferent To Decedent's Serious Mental-Health Needs, Causing His Death.**

As a second basis for § 1983 liability, the Fourteenth Amendment compelled the County and its agents to protect Decedent as a pretrial detainee from the risk of self-harm. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010), *overruled on other grounds*, *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

*Castro*, which arose from  inmate-on-inmate violence, followed the Supreme Court's lead in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), an excessive-force case, by adopting the standard of "objective deliberate indifference" for § 1983 claims by pretrial detainees. *Gordon v. Cty. of Orange*, 888 F.3d 1118 (9th Cir. 2018), "hold[s] that claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Id.* at 1124-25. "Thus, the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 1125 (citing *Castro*, 833 F.3d at 1071). The elements of the claim are:

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case.

*Id.* at 1071 (footnote omitted) (citing *Kingsley*, 135 S. Ct. at 2473 (2015)).

- 12 -

Each element is supported by evidence in the record. First, Defendants made an "intentional decision" to release Scott without treatment and without a plan or resources although he still displayed the mania that landed him in the jail's mental health unit in the first place. Second, there is ample evidence that doing so put Scott at a substantial risk of serious harm. Third, there were "objectively reasonable" alternatives. A psychiatrist at the jail could have prescribed medications.[3] Scott could have been placed on a 72-hour hold pursuant to Cal. Welf. & Inst. Code § 5150 and sent to a psychiatric hospital for the evaluation and treatment he did not receive in the jail mental-health unit. Finally, Scott could have been put into contact with his mother and other family members who, as they had done in Hawaii, would have rushed to help. Fourth, there is, at minimum, a genuine issue whether the decision to release Scott while severely manic, penniless and alone in a strange city proximately caused his death.

Accordingly, Plaintiffs have carried their burden by establishing genuine issues that preclude summary judgment on whether Defendants' deliberate indifference deprived their son of the Fourteenth-Amendment right to mental-health treatment.

**C.    Defendants Violated Decedent's Right to Be Free from Deliberate Indifference to State-Created Danger.**

A day after his arrest, the LAPD took Scott to the County Jail mental-health unit to be treated for florid symptoms of his Bipolar 1 disorder. For another two-and-a-half days Scott was subjected to the stress of the jail environment, but was released untreated, gravely disabled and unable to care for his own safety. Such state created danger provides an independent basis for Fourteenth-Amendment liability.

This circuit first recognized such "danger creation" liability in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989). In *Wood*, a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer's actions allegedly left Wood, a

---

[3]A jail psychiatrist could have furnished Scott psychotropic medications to take with him when released. Peña Dep. 30:21-25.

1  female passenger, stranded late at night in a known high-crime area.

2  Subsequently, Wood accepted a ride from a passing car and was raped.

3  This court held that Wood could claim § 1983 liability, since a jury

4  presented with the above facts could find "that [the trooper] acted with

5  deliberate indifference to Wood's interest in personal security under the

6  fourteenth amendment." *Id.* at 588.

7  Since *Wood*, this circuit has held state officials liable, in a variety of

8  circumstances, for their roles in creating or exposing individuals to danger

9  they otherwise would not have faced.

10  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006) (citing, among other

11  authorities, *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) (rape of jail nurse left alone

12  with sex-offender); *see also, e.g., Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir.

13  2018) ("kettling" demonstrators with violent counter-demonstrators); *Maxwell v. Cty. of*

14  *San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (police delay shooting victim's ambulance

15  to secure crime scene); *Penilla v. City of Huntington Park*, 115 F.3d 707, 709-11 (9th Cir.

16  1997) (police move ill man from front porch to inside empty house and closed door).

17  The Ninth Circuit requires the state actor to "recognize[ ] [an] unreasonable risk

18  and actually intend[ ] to expose the plaintiff to such risks without regard to the

19  consequences to the plaintiff." *Grubbs*, 92 F.3d at 899. Defendants did so when

20  releasing Scott manic and without a plan.

21  **IV.    Genuine Issues Preclude Summary Judgment As To Each Defendant.**

22  **A.    The County Was Deliberately Indifferent.**

23  Ninth Circuit rulings that uphold entity liability based on the deliberate

24  indifference to the risk of jail suicide date back at least to *Cabrales v. Cty. of Los Angeles*,

25  864 F.2d 1454, 1461 (9th Cir. 1988) ("The omission by the County and its policymakers

26  in providing adequate medical care at the Men's Central Jail was the policy or custom

27  that was the 'moving force' behind the deprivation of the decedent's constitutional

28  rights."). Despite efforts to fix the problem, this case shows it persists.

- 14 -

The County can be held liable under § 1983 for "deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 36 (2010) (quoting *Monell*, 436 U.S. at 690-91). "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). Plaintiffs identify at least two such customs here.

The first was acknowledged by County spokesperson Luis Peña. The written policy requiring a psychiatrist to evaluate "urgent" patients within a day of their assignment to HOH is disregarded when court appearances conflict with scheduling. Peña Dep. 23:20-24:10, 27:11-23. Plaintiffs contend that the psychiatric evaluation was essential to their son's mental health and should have been prioritized. While the trip to court was also important,[4] it functioned here as an excuse to shirk responsibility. The psychiatric evaluation could have occurred either during the 27 hours Scott was in HOH before going to court, or during the 19 hours between his return and release. *See* Feroli Decl., para. 5(b)(ii), 5(c)(i), 5(c)(2), 5(d)(viii). A psychiatrist would have provided Scott psychotropic medications to take with him when released. Peña Dep. 30:21-25.

The second defective County practice was allowing employees not authorized to order § 5150 holds, such as Nurse Turner, to perform release evaluations. Peña Dep. 38:4-20. Especially in a case such as this one, where an inmate deemed "significantly impaired" has not been evaluated by a psychiatrist, but can no longer be held as a pretrial detainee, the decision whether to impose a three-day civil commitment should be made by a mental-health professional qualified to follow through with the process.

*Castro* upheld a jury verdict under *Monell* based on an inmate's "constitutional right to have reasonable measures taken to guarantee his safety when he was incarcerated." 833 F.3d at 1074 (lack of electronic monitoring). Similarly, in *Horton by*

---

[4]Los Angeles criminal law attorneys are familiar with "miss outs," inmates who are supposed to have been brought to court, but did not make it onto the bus.

1   *Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019), the jail "failed to ensure

2   compliance with its written policy of removing belts from detainees" or "to assure

3   proper monitoring of its security cameras," leading to a suicide attempt. *Id.* at 604-05.

4   > [A]s we have previously acknowledged, constitutional deprivations may

5   > occur "not . . . as a result of actions of the individual officers, but as a

6   > result of the collective inaction" of the municipal defendant. *Fairley v.*

7   > *Luman*, 281 F.3d 913, 917 (9th Cir. 2002). "If a plaintiff establishes he

8   > suffered a constitutional injury by the City, the fact that individual officers

9   > are exonerated is immaterial to liability under § 1983," regardless of

10  > whether their exoneration is "on the basis of qualified immunity, because

11  > they were merely negligent, or for other failure of proof." *Id.* at 917 & n.4.

12  > Here, a reasonable jury might be able to conclude that [the plaintiff]

13  > suffered a constitutional deprivation "as a result of the collective inaction"

14  > of the [defendant] Department, *id.* at 917, or of officers' adherence to

15  > departmental customs or practices.

16  *Id.* at 604. Because a reasonable jury could come to a similar conclusion here, the

17  County's motion for summary judgment should be denied.

18      **B.    Defendants Belavich Is Subject To Supervisory Liability.**

19      Defendant Timothy Belavich, Ph.D., contends he is not liable because he did not

20  interact with Scott and did not directly supervise the jail employees who did. Defs.'

21  Mot. at 13-14; Belavich Decl., para. 7. That is not Plaintiffs' theory of liability.

22      Dr. Belavich acknowledges that he was "Director of Jail Mental Health."

23  Belavich Decl., para. 4. He was therefore personally responsible for the systems that

24  failed Scott Gilbert. In 2018 Director Belavich was on notice that releasing untreated

25  mentally-ill inmates placed them at risk. Denying a motion for judgment on the

26  pleadings in an action by the Department of Justice, Judge Pregerson determined that

27  many inmates "entered the jail system largely as a result of their mental health

28  conditions, and that those conditions have then been aggravated by incarceration and,

- 16 -

in some cases, the denial of medication. [Mentally-ill inmates] have then been released onto the streets, often in a more vulnerable, less stable state than when they entered the jail system." *United States v. Cty. of Los Angeles*, No. 15-CV-5903 DDP, 2016 WL 2885855, at *3 (C.D. Cal. May 17, 2016). Judge Pregerson continued, "Defendants' discharge policies are designed to achieve certain goals, which may or may not be limited to constitutional or other floors. Defendants presumably do not, and could not, for example, simply show a severely ill inmate to an exit without any concern for what might befall that inmate on the other side of the door." *Id.* *5 (footnote omitted).

The County's practice that allows court appearances to block psychiatric examinations guaranteed that on occasion inmates deemed "substantially impaired" by mental illness will be released without a psychiatric evaluation, and therefore without the necessary psychotropic medications. Moreover, Dr. Belavich tolerated a regime that allowed staff not authorized to impose 72-hour holds to serve as the last line of defense preventing mentally-ill people such as Scott Gilbert from slipping through the cracks.

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct showing a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). The standard is whether the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id.* (brackets omitted); *See also* Ninth Circuit Model Jury Instruction No. 9.4 (Rev. Sept. 2018).

Director Belavich is not entitled to qualified immunity. He had notice that "A state's failure to provide medication sufficient to cover" a released inmate's "transitional period amounts to an abdication of its responsibility to provide medical care to those, who by reason of incarceration, are unable to provide for their own medical needs." *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999).

1    Accordingly, Plaintiffs have established genuine issues that preclude summary

2    judgment in favor of Defendant Belavich.

3        **C.    Defendant Turner is not entitled to Qualified Immunity.**

4    Plaintiffs' expert, Nathan A. Lavid, M.D., concluded "that Nurse Turner

5    consciously disregarded a substantial risk of harm to Mr. Gilbert's health and safety

6    when assessing him," and should not have "releas[ed] him without a plan, or attempting

7    to put him in contact with his mother. He should have been placed on a 72-hour § 5150

8    hold." Lavid Decl., para. 13. That opinion testimony, with the evidence supporting it,

9    establishes a genuine issue whether Nurse Turner violated Scott's Fourteenth-

10   Amendment right to be free from deliberate indifference while in County custody.

11   Nurse Turner is not entitled to qualified immunity if her conduct, when viewed

12   in the light most favorable to Plaintiffs, violated "clearly established law." *Hope v. Pelzer*,

13   536 U.S. 730, 739 (2002). "For a constitutional right to be clearly established, its

14   contours must be sufficiently clear that a reasonable official would understand that what

15   he is doing violates that right. This is not to say that an official action is protected by

16   qualified immunity unless the very action in question has previously been held unlawful,

17   but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

18   *Id.* Thus, to "determine whether [a public official] violated clearly established law, we

19   look to cases relevant to the situation [the public official] confronted, mindful that there

20   need not be a case directly on point." *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005,

21   1013 (9th Cir. 2016).

22   Here, however, there is a case directly on point, *Wakefield v. Thompson* provided

23   notice to Nurse Turner that releasing Scott without medications would violate his

24   constitutional rights.

25   Moreover, a public official who violates policy or training when depriving

26   another of a constitutional right can be on notice that the conduct is not protected by

27   qualified immunity. *Groh v. Ramirez*, 540 U.S. 551, 563-64 (2004) (no qualified immunity

28   where "guidelines of petitioner's own department placed him on notice that he might

- 18 -

1    be liable"). This rule is well established in the Ninth Circuit. *See Drummond v. City of*
2    *Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("training materials" relevant to whether
3    reasonable officer on notice force was unlawful); *Headwaters Forest Def. v. Cty. of*
4    *Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (no qualified immunity where officers
5    violated police protocol); *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1162 n.7, 1168 n.9
6    (9th Cir. 2011) (qualified immunity denied citing defendant's violation of police officer
7    training standards); *see also*, *e.g.*, *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d
8    415, 433-34 (2d Cir. 2009) ("disregard of established procedures for responding" to
9    incident supported denying qualified immunity); *Wright v. Smith*, 21 F.3d 496, 500 (2d
10   Cir. 1994) (no qualified immunity where state regulations "gave . . . officials clear
11   notice" of liability).  In rejecting qualified immunity for the jailors in *Castro*, the Ninth
12   Circuit, en banc, pointed to the fact that "they knew or should have known that the
13   jail's policies forbade" their actions. 833 F.3d at 1073.

14          The policies governing Nurse Turner's release investigation are Defendants'
15   Exhibit DD - 236-40. First, she was required to "conduct a mental status assessment to
16   ensure that the client does not require acute psychiatric hospitalization." *Id.* at 238.
17   Nurse Turner charted that Scott "exhibits 0 s/s," meaning no symptoms, "of . . .
18   psychiatric distress." Ex. L-123. Video Exhibits N and O made a few hour later in the
19   jail release lobby, however, show that cannot have been the case. When a party's
20   "version of events is" discredited by video, a reviewing court cannot rely "on such
21   visible fiction; it should [view] the facts in the light depicted by the videotape."  *Scott v.*
22   *Harris*, 550 U.S. 372, 380-81 (2007). At minimum this establishes a genuine issue.

23          Second, the policy required Nurse Turner to "review the release plan and any
24   immediate needs with the client and assist with implementing the plan, including
25   arranging transportation to the treatment program or housing whenever possible," and
26   "mental health clients that are receiving psychotropic medications shall be provided
27   30-day prescriptions for release medications," as well as "a three-day supply of
28   medications, obtained through the Sheriff's Medical Services Bureau." Ex. L-123-24.

1    Nurse Turner's chart entry states:

2    Patient verbalizes plan to take public transportation and return to previous

3    place of residence—"I'm going back to my friend's in LA and possibly back

4    to my mom in Wisconsin . . ." With regards to mental health treatment,

5    patient endorses intention to seek treatment at local mental health facility—"I

6    can go back to the private doctor . . ." Patient endorses intending to financially

7    support self via continuing to receive GR [general relief].

8    Ex. L-123. When confronted at her deposition with the facts that Scott had alienated

9    Audrey, the only person he knew in Los Angeles, that he could not take "public

10   transportation" to Wisconsin, that he lost his wallet before his arrest, that he did not

11   have a local doctor nor access to psychotropic medications, that he was not receiving

12   general relief, and that he had only $1.79, Nurse Turner says she did not "delve into"

13   such information because that was beyond her "scope." Instead, she claims her

14   evaluation was based solely on what Scott told her when clearing his release. Turner

15   Dep. 62:4-6; 64:3-4; 65:5-6; Ex. L-123; Defs.' UF No. 44. That is directly contrary to

16   policy, which required her to "review the release plan and any immediate needs with the

17   client and *assist with implementing the plan*." Ex. DD-238 (emphasis added).

18   According to the Supreme Court, "Qualified immunity gives government

19   officials breathing room to make reasonable but mistaken judgments about open legal

20   questions. When properly applied, it protects 'all but the plainly incompetent or those

21   who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citing

22   *Malley v. Briggs*, 475 U.S. 335, 341 (1986). There are no "open legal questions" here. For

23   almost a half century, "deliberate indifference to serious medical needs of prisoners"

24   has been a recognized constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)

25   (Eighth Amendment).

26   Policies are worthless unless they are followed. On this record a jury could find

27   that Nurse Turner disregarded the standards for a release evaluation. She chose to avoid

28   the hassle of finding someone to place him on a § 5150 hold, or tracking down a

- 20 -

1    psychiatrist to conduct an examination so Scott could get medications, or even putting

2    Scott in contact with his mother so that some sort of arrangements could be made for

3    his welfare after he walked out of the jail. She did none of that. Her deliberate

4    indifference was, by definition, "incompetent."

5    **V.      The County Violated the ADA and the RA By Excluding Decedent From**

6    **Treatment For His Mental Disability.**

7             Scott Gilbert's disabling Bipolar 1 Disorder made him a "qualified individual"

8    under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12131(2).  Title II of the

9    ADA requires public entities to refrain from excluding such individuals from

10   participation in a public program because of their disability. § 12132. Section 504 of the

11   Rehabilitation Act (RA ) of 1973, 29 U.S.C. § 794; 28 C.F.R. 42.540(k), applies because

12   the County receives federal funds, and is within the RA's mandate that no person with a

13   disability may be excluded from any program or activity. 29 U.S.C. § 794.

14            The ADA and RA apply to medical programs in jails. *See Pierce v. Cty. of Orange*, 526

15   F.3d 1190, 1214 (9th Cir. 2008) (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210

16   (1998)); *accord United States v. Georgia*, 546 U.S. 151, 157 (2006). "To establish a violation of

17   Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a

18   disability; (2) [he] was excluded from participation in or otherwise discriminated against with

19   regard to a public entity's services, programs, or activities; and (3) such exclusion or

20   discrimination was by reason of [his] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th

21   Cir. 2002).

22            In *Atayde v. Napa State Hosp.*, 255 F. Supp. 3d 978 (E.D. Cal. 2017), District Judge

23   Drozd held that the denial of mental health treatment of a person in custody leading to

24   suicide violated the ADA. The *Atayde* decedent was a county jail inmate who, like Scott

25   Gilbert, exhibited pronounced signs of mental illness. Arrangements were made to

26   transfer him to a state mental hospital, but that did not happen for reasons disputed by

27   the parties. The inmate hanged himself. The court rejected the argument the County

28   makes here. Defs.' Mot. at 20-21, that

1   plaintiff cannot state a cognizable ADA or RA claim for failure to provide

2   medical treatment when the decedent's handicapping condition related to

3   the condition for which he sought treatment. . . . That is, plaintiff cannot

4   allege decedent was excluded from participation in a medical treatment

5   program for which he was otherwise qualified, or that this exclusion was

6   by reason of his disability, when decedent was not provided treatment that

7   he only needed because he was disabled.

8        . . . .

9        . . . [T]he court does find that plaintiff has adequately pled facts

10   supporting a failure to accommodate claim under the ADA and RA.

11   Plaintiff has alleged that all of the defendants had knowledge of decedent's

12   disability, and were aware of the state court order mandating decedent's

13   transfer to [the state hospital] for restorative treatment. . . . Plaintiff has

14   also alleged that, as a result of defendants' failure to admit decedent to [the

15   state hospital], decedent was excluded from participating in [the state

16   hospital's] mental health services and given no possibility of access to

17   those programs.

18   *Id.* at 1003. While there was no state court order mandating treatment of Scott Gilbert,

19   the LAPD used a BOMHR and Nurse Hernandez assigned him to HOH, requiring

20   evaluation by a psychiatrist. When that did not happen, and Nurse Turner failed to

21   initiate the § 5150 hold procedures. Scott Gilbert, like the *Atayde* decedent, was

22   excluded from participating in the County's mental health services.

23        Defendants contend Scott "was provided medical and mental health care,

24   including a release evaluation, and access to resources upon release," Defs.' Mot. at 21,

25   but genuine issues preclude such a finding under Rule 56. Although Nurse Hernandez

26   directed Scott to HOH, where he *should* have been seen by a psychiatrist and prescribed

27   medications, that did not happen, and Nurse Turner's release evaluation was little more

28   than a rubber stamp tantamount to an outright denial of mental-health care. *See also*, *e.g.*,

- 22 -

1   *Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal.

2   Sept. 13, 2010) (plaintiff stated ADA claim by alleging "that Defendants failed to

3   provide [plaintiff] with any access to mental health programs and services," and an

4   "outright denial of medical services"). Scott was so manic that he walked out of the

5   Jail's release lobby without his phone or $1.79.

6       In sum, because Scott had a disability and the County failed to treat it or to refer

7   him to a psychiatric facility for desperately needed treatment, instead releasing him to

8   wander skid row, Plaintiffs have established a genuine issue whether the County denied

9   him meaningful access to state-provided services in violation of the ADA and RA.

10  *United States v. Cty. of Los Angeles, supra,* at *5.

11      Accordingly the County's summary judgment motion on the ADA and RA

12  claims should be denied so that the disputed issues of fact can be resolved at trial.[5]

13  **VI.    Plaintiffs Have Alleged Wrongful-Death Claims Under Cal Gov't Code**

14  **§ 845.6 For Failure To Summon Medical Attention and For Negligence.**

15      Plaintiffs assert two supplemental state-law claims. The first, Cal. Gov't Code

16  § 845.6, provides that "a public employee, and the public entity . . ., is liable if the

17  employee knows or has reason to know that the prisoner is in need of immediate

18  medical care and he fails to take reasonable action to summon such medical care." The

19  Ninth Circuit has explained, "Notably, under this statute, there is no analogue to the

20  second prong of federal qualified immunity. Also, in contrast with *Monell* liability,

21  California law allows for vicarious liability of a municipality whose employee violates

22  the statute when acting within the scope of employment." *Horton by Horton v. City of*

23  *Santa Maria*, 915 F.3d 592, 605 (9th Cir. 2019). Summoning the requisite medical care

24  required only that Nurse Turner find a jail psychiatrist to evaluate Scott, and provide

25  medications, before releasing him.

26

27  _____

28      [5]Plaintiffs withdraw their claim under Cal. Civ. Code § 54, the state analogue to the
    ADA, because it is limited to physical access, not denial of services. *E.g., Wilkins-Jones v.*
    *Cty. of Alameda*, 859 F. Supp. 2d 1039, 1054 (N.D. Cal. 2012).

The second state-law claim is for negligence. Plaintiffs allege that at minimum the County, and Nurse Turner in particular, were negligent by failing to warn Leslie Gilbert that her mentally-ill son was being released, manic and with no resources.

This case is on all fours with *Johnson v. County of Los Angeles*, 143 Cal. App. 3d 298 (1983), which upholds both claims, and rejects the same state-law immunities that Defendants assert here. Plaintiffs urge the Court to follow *Johnson*. The court of appeal summarized the facts:

> Decedent, who was driving on the wrong side of the freeway, was arrested . . . . Shortly thereafter, Wife informed Sheriffs that Decedent was a paranoid schizophrenic, had been repeatedly hospitalized, and required immediate medication (thorazine) to correct a chemical imbalance which created Decedent's aberrant conduct. Wife further informed Sheriffs that Decedent had suicidal tendencies requiring immediate medical attention, and should not be released. Sheriffs acknowledged that Decedent required medical attention, promised to hospitalize and medicate him, and advised Wife not to worry or interfere. . . . Decedent was released from Los Angeles County Jail without notice [to family], and [two days later] he committed suicide.

*Id.* at 304. The court upheld the claim for negligence based on the failure to notify the family that the decedent was being released.

> Sheriffs here stood in a special relationship to Decedent and to [his family], and had a duty to warn [them] before releasing Decedent. As noted above, the courts have imposed affirmative duties in cases where the defendant governmental authority stands in some special relationship either to the person whose conduct needs to be controlled, or to the foreseeable victim of that conduct. The instant case is unique in that, since it involves a suicide, the person whose conduct needed to be controlled was also the foreseeable victim of that conduct. In light of the policy considerations underlying the

- 24 -

1    imposition of affirmative duties, this singular setting does not undermine,

2    but rather supports, the imposition of a duty: in the case of Decedent,

3    Sheriffs stood in a special relationship both to the victim and to the person

4    whose conduct created the danger. By releasing Decedent from custody

5    without a prior warning to [his family], Sheriffs placed Decedent in a

6    position of clearly foreseeable danger.

7    *Id.* at 311.

8         Second, the court of appeal found that plaintiffs stated a claim for failure to

9    summon medical care. *Id.* at 316-17. "In order to state a claim under § 845.6, a prisoner

10   must establish three elements: (1) the public employee knew or had reason to know of

11   the need (2) for immediate medical care, and (3) failed to reasonably summon such

12   care." *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006).  *Flores v. Natividad Medical Center*,

13   192 Cal. App. 3d 1106 (1987), is instructive. Doctors and other medical professionals

14   treated a state-prison inmate at the facility infirmary. He should have been sent to the

15   hospital instead. The delay caused additional injury. The court of appeal affirmed the

16   jury's verdict against the state, which employed the prison staff, based on § 845.6.

17        The same result should follow here. Summary judgment should be denied on

18   Plaintiffs' § 845.6 and negligence claims.

19   **VII.   Conclusion**

20        For the foregoing reasons, Defendants' Motion for Summary Judgment should

21   be denied in all its particulars, except as to Plaintiffs' claim under Cal. Civ. Code § 54.

22   Respectfully submitted,

23

24   Dated: July 18, 2022          THE LAW OFFICES OF JOHN BURTON
                                      UCI LAW CIVIL RIGHTS LITIGATION CLINIC

25

26

27                       By:  /S/ John Burton
                                           John Burton
                                           Attorneys for Plaintiffs

28

- 25 -